IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT LEE WOODS, | ) | CASE NO. 1:15CV610 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DAN AARON POLSTER |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Robert Lee Woods ("Woods") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

Woods protectively filed an application for DIB on May 30, 2012, alleging a disability onset date of May 10, 2010.  Tr. 212, 217.  He alleged disability based on the following: "anxiety, emotional, depression."  Tr. 231.  After denials by the state agency initially (Tr. 114) and on reconsideration (Tr. 121), Woods requested an administrative hearing.  Tr. 146.  A hearing was held before Administrative Law Judge ("ALJ") Eric Westley on May 7, 2014.  Tr. 61-113.  In his May 21, 2014, decision (Tr. 18-32), the ALJ determined that there were jobs that

existed in significant numbers in the national economy that Woods could perform, i.e., he was not disabled.[1]  Tr. 30.  Woods requested review of the ALJ's decision by the Appeals Council (Tr. 11) and, on January 23, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Woods was born in 1958 and was 54 years old on the date his application was filed.  Tr. 239.  He received a GED in 1986.  Tr. 232.  At the time of the hearing, he was working part-time as a dishwasher.  Tr. 67.  He previously worked on a road crew holding stop signs, as a packager, and as a general laborer separating power line material and operating a forklift.   Tr. 71-75.

### B.  Relevant Medical Evidence[2]

On October 24, 2011, Woods saw Anuradha Rameneni, M.D., complaining of mild headaches he experienced daily.  Tr. 308.  He had no associated symptoms; no problems sleeping; no stress or depression.  Tr. 308.  Upon examination, he was cooperative, alert and oriented; had a normal mood and affect; and exhibited normal behavior and thought content.  Tr. 308-309.

On April 27, 2012, Woods saw Dr. Rameneni for a follow-up visit.  Tr. 306.  Woods reported that he had "a lot of anxiety" that he felt interfered with his sexual activity.  Tr. 306.  He had seen a urologist who prescribed Zoloft, which he did not take every day.  Tr. 306.  Upon examination, Woods was alert and oriented, had a normal mood and affect, and exhibited normal

---

[1]  The ALJ discussed a prior ALJ's decision, dated 2006, finding that Woods can perform simple, repetitive tasks akin to unskilled work.  Tr. 26-27; Tr. 132-138.

[2]  Woods only challenges the ALJ's decision with respect to his mental impairments.  *See* Doc. 13.  Accordingly, only the medical evidence relating to Woods' mental impairments is summarized herein.

behavior and thought content.  Tr. 306.  Dr. Rameneni assessed Woods with anxiety and sexual dysfunction, and recommended that he take his Zoloft every day.  Tr. 306.

On July 17, 2012, Woods saw psychiatrist Young Wung Rhee, M.D.  Tr. 294.  Woods reported that he had been depressed for many years.  Tr. 294.  He had previously taken medication but had not done so since 2008.  Tr. 294.  He complained of being moody, angering easily, having an inability to pay attention, being easily distracted, and talking to himself.  Tr. 294.  He reported a history of drug and alcohol abuse and denied having a GED.  Tr. 294.  Dr. Rhee diagnosed Woods with depressive disorder, attention deficit hyperactivity disorder (ADHD), history of drug and alcohol abuse, rule out shizoaffective disorder, rule out mild mental retardation, and anti-social personality disorder.  TR. 294.  He assigned a Global Assessment of Functioning ("GAF") score of 55 and recommended counseling.[3]  Tr. 294.

On July 25, 2012, Woods saw Dr. Rameneni for paperwork to apply for disability.  Tr. 297.  Woods reported that he was in special education classes for a learning disability from third to tenth grade and, contrary to his statement to Dr. Rhee, that he earned his GED.  Tr. 297.  He had been in prison five times for drug possession and was diagnosed with mild mental retardation by a prison psychiatrist.  Tr. 297.  He had been taking Celexa for his depression, which "helps a little."  Tr. 297.  He stated that he can perform simple jobs like cleaning but that it takes him longer to do it than other people, and he is unable to perform jobs needing more complex instructions.  Tr. 297.  He tried five jobs in the last year but could not hold a job for more than one month.  Tr. 297.  He reported fatigue, sleep disturbances, and dysphoric mood.  Tr. 297.  He denied nervousness or anxiety.  Tr. 297.  Upon examination, Woods was alert and

---

[3]  GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

oriented, had a normal mood and affect, and exhibited normal behavior and thought content.  Tr. 298.  Dr. Rameneni diagnosed Woods with "general learning disability" and depression.  Tr. 298.

On October 17, 2012, Woods reported to Dr. Rhee that he wants to work but physically cannot do so.  Tr. 319.  He advised that he had begun working at a packaging company ten hours a day, seven days a week.  Tr. 319.  On January 2, 2013, he reported that he was unable to keep up with the work and that he had been laid off and was no longer working.  Tr. 319.  He complained that his mood was up and down and that he had a quick temper, increased irritability, and trouble sleeping.  Tr. 319.  Dr. Rhee increased Woods' dose of Celexa to 30 mg and instructed him to return to the office in two months.  Tr. 319.  Woods did not return.  Tr. 319.

On May 22, 2013, Woods saw Erin Nagrant, M.D., for a physical and to get his medications refilled.  Tr. 329.  He started his visit by stating, "I was taught in narcotic anonymous to be honest.  I don't like doctors.  I can't work."  Tr. 329.  Woods reported that he had a mood disorder but could not "explain the details of his initial diagnosis or his symptoms."  Tr. 329.  He had not established care with a psychiatrist, "knows he needs to establish with a psychiatrist," and "plans to 'get it all out when I meet the psych doc.'"  Tr. 329.  He relayed that he had applied for disability and that his mental illness made work "impossible."  Tr. 329.  Upon examination, Dr. Nagrant observed that Woods appeared well and was alert.  Tr. 330.  Woods stated that his mood was stable.  Tr. 331.  Dr. Nagrant refilled his medication.  Tr. 331.

On June 11, 2013, Woods was seen for an initial psychiatric assessment at Psychological and Behavioral Consultants.  Tr. 323-326.  He complained of depression that was not improving and no other symptoms.  Tr. 323, 324.  His depression had a moderate impact on functioning and activities of daily living.  Tr. 323.  He denied a learning disability.  Tr. 324.  Upon examination,

he was alert and cooperative with good eye contact.  Tr. 325.  He was noted as having average intelligence, normal speech, appropriate affect, good insight, fair judgment, and coherent thought processes.  Tr. 325.  His mood was anxious and depressed.  Tr. 325.  He was diagnosed with major depressive disorder, moderate, recurrent, and assigned a GAF score between 50 and 60.  Tr. 326.  He was prescribed Wellbutrin and Celexa.  Tr. 326.

On July 23, 2013, Woods returned for a follow-up appointment.  Tr. 321.  He reported that he was getting better and doing well. Tr. 321.  His mood was a 6/10, ten being the best.  Tr. 321.  Upon examination, Woods was alert, had a normal thought process, and had intact attention/concentration, insight and judgment.  Tr. 321.  He displayed an anxious, depressed mood, depressed affect, and ruminating thought processes.  Tr. 321.  His dose of Wellbutrin was increased and he was assessed as improving. Tr. 322.

Treatment notes from October 2, 2013, were mostly unchanged. Tr. 327.  Woods continued to improve and feel better.  Tr. 327.  He reported that he was starting a job the next day.  Tr. 321.

On November 27, 2013, Woods saw Dr. Nagrant for disability paperwork.  Tr. 339-340.  He reported that, due to physical pain, he was not able to keep up with his peers at work.  Tr. 339.  He stated that his visits with Psychological and Behavior Consultants were going well.  Tr. 339.  He relayed that his diagnosis of mild mental retardation since birth made it difficult for him to follow directions and complete tasks.  Tr. 339.  He can handle "simple, defined tasks, but cannot perform the executive functions to multitask or problem solve well."  Tr. 339.  Upon examination, Woods was alert and his mental status was intact.  Tr. 340.  Dr. Nagrant wrote that Woods' "significant psychiatric and mental impairments mak[e] it difficult for him to find work and work in a reliable and consistent fashion."  Tr. 340.

### C. Medical Opinion Evidence

#### 1. Treating Source Opinion

On July 17, 2012, Dr. Rhee produced a letter in which he indicated that he first saw Woods on June 4, 2012.  Tr. 294.  He commented that Woods reported being depressed for many years, stopping his medication in 2008, had no psychiatric inpatient treatment, and had been married for 13 months at that time.  Tr. 294.  Woods "stated he can't perform task[s] and can't grasp simple concepts."  Tr. 294.

On September 26, 2012, Dr. Rhee filled out a form summarizing his treatment of Woods from June through August 2012.  Tr. 311-313.   Dr. Rhee indicated depression, mood swings, easy anger and distractibility, inability to focus, inability to perform tasks and grasp simple concepts, auditory hallucinations, and talking to himself.  Tr. 312.  Dr. Rhee indicated that Woods has "marginal" cognitive ability and fund of knowledge and "short" attention and concentration.  Tr. 312.  He assigned a GAF score of 55 and concluded that Woods could manage benefits if awarded.  Tr. 312-313.

#### 2. Consultative Examiners

On January 30, 2014, Woods saw psychologist Richard Davis, M.A., for a psychological consultative examination.  Tr. 350-360.  Woods stated that he "sees himself as unemployable because of physical and emotional problems plus learning disabilities."  Tr. 353.   He reported that he spent 23 years of his life in prison for drug involvement, that he rents a house with his wife, and that he has a job washing dishes a few days a week.  Tr. 353.  He is able to ride buses by himself, although a friend brought him to the examination.  Tr. 354.   He is dependent upon his wife, who helps him dress by picking out his clothes for him.  Tr. 355, 356.  When asked why his wife helps him dress, he replied, "I don't know.  She's always done that."  Tr. 355.  He stated

that he "tr[ies] to do as little as possible" because everyone has always done things for him.  Tr. 356.  He has "trouble getting along with people in positions of authority when he is employed because '[t]hey tell me I never do a good job'" and that he has similar problems with coworkers. Tr. 355.  He has a few friends, a non-active social life, and "sees and gets along with [his four siblings] for the most part."  Tr. 356.   He stated that he does not read very well, has no interests or hobbies, and spends his entire day watching television.  Tr. 356.  He engages in no outside activities such as movies, plays, or sporting events.  Tr. 357.  He does not attend classes and he does not look for work; he has no goals.  Tr. 357.

Mr. Davis stated that interviewing Woods "was not an easy task.  He is very limited intellectually and sees the world differently than most people."  Tr. 355.  Woods appeared clean, neat and well-groomed and he was cooperative.  Tr. 355.  He had a dull affect and described feelings of worthlessness.  Tr. 355, 359.  His flow of conversation and thought was satisfactory and he tended to ramble such that Mr. Davis had difficulty getting questions answered directly. Tr. 355.  Mr. Davis could eventually get answers from him but they were of "questionable validity" since his responses were "loosely structured, circumstantial and tangential presented with poverty of speech and a tendency to go on and on about things that were irrelevant."  Tr. 355.  Woods could not perform serial 3s or serial 7s and his math skills were limited to easy addition and subtraction using his fingers.  Tr. 356.  He was "extremely limited in his abilities to think logically and use common sense and judgment."  Tr. 356.  He recalled one of six words after a five-minute delay.  Tr. 356.  He had trouble paying attention and concentrating during the interview. Tr. 357.

Regarding Woods' ability to understand, remember, and carry out instructions, Mr. Davis assessed Woods as having a mild limitation in one out of six areas, a mild to moderate limitation

in one area, a moderate limitation in one area, and marked to extreme limitations in the
remaining the areas.  Tr. 350.  He opined that Woods has a moderate limitation in one of out of
four areas in his ability to interact appropriately with supervisors, coworkers, and the public, and
moderate to marked limitations in the remaining three areas.  Tr. 351.  Mr. Davis opined that
Woods should be "limited to easy, non-stressful type employment situations."  Tr. 351.  He
diagnosed Woods with adjustment disorder with mixed anxiety and depressed mood,
polysubstance dependence, borderline intellectual functioning, and dependent personality
disorder.  Tr. 358.  He assigned a GAF score of 45.  Tr. 358.

Mr. Davis described Woods as a "totally dependent person" who relies on other people to
do almost everything for him.  Tr. 358.  He observed that Woods does not keep a job for very
long but also noted that he stayed employed for six years tearing apart salvage material.  Tr. 358.
He opined that Woods would have difficulty understanding, remembering and carrying out
"more than just the simplest of instructions," observing that Woods' prior employment had been
limited to "that which is very simple and repetitive" and that he still had difficulty performing
the jobs satisfactorily.  Tr. 357.  Mr. Davis advised that Woods had trouble paying attention and
concentrating and "would do poorly when making attempts to do these things."  Tr. 357.  Mr.
Davis anticipated that Woods would have difficulty dealing with stress and pressure, explaining
that he had to be careful how much he could "push" Woods and had to "back off" when he could
see him becoming upset.  Tr. 358.  He concluded that Woods would not be capable of managing
funds if granted benefits.  Tr. 360.

**D.  Testimonial Evidence**

**1.  Woods' Testimony**

Woods was represented by counsel and testified at the administrative hearing.  Tr. 62-92. He lives with his wife and her adult son and he also sees his wife's grandchildren.  Tr. 66.  He has a goddaughter in North Carolina with whom he is in contact.  Tr. 67.

Woods testified that he currently works three days a week washing dishes at a restaurant for 18 to 20 hours a week.  Tr. 67.  He has worked there for six months.  Tr. 70.  When asked if he could work 40 hours a week, he stated that he could try but that the restaurant does not give anyone 40 hours a week.  Tr. 68.

When he washes dishes he gets distracted and has to slow down.  Tr. 68.  He attributed this to the medication that he takes.  Tr. 68.  When this happens, he goes to the bathroom for a "couple of minutes."  Tr. 69, 85.  He does this about twice during a six-hour shift.  Tr. 85.  He believes his co-workers take the same amount of breaks.  Tr. 87.  He has never been sent home from this work and no one has spoken to him about his performance there.  Tr. 69, 86.  When asked if he had any problems with his co-workers, he responded, "you always have certain problems with certain co-workers. . . . it comes with the job[.]"  Tr. 69.  He tries to deal with it because that is what normal people do and he is trying to be normal.  Tr. 69-70.  When asked if that is working for him, he stated, "I think it is," but that the answer really depends on how other people perceive him.  Tr. 70-71.

Woods previously worked holding a sign for a road crew but no longer does this work because he moved to the other side of town and it is not as accessible.  Tr. 71.  He believed that he was terminated from his packaging job because his supervisor found out he had been incarcerated.  Tr. 73.  He worked doing general labor for a salvage company for six years and, for a time, drove a forklift.  Tr. 73.  He had a lot of problems with co-workers but he tried to ignore them.  Tr. 77.  He stopped working there when the business moved and he was not invited

9

to continue employment.  Tr. 78.  When asked why he could not perform a regular full-time job, he answered, "I really don't know. . . . I cannot explain it."  Tr. 79.

Woods stated that he is taking Wellbutrin and citalopram.  Tr. 80.  They help to a degree but they make him feel "spaced out."  Tr. 81.  He has been on them for about a year and the dosage had recently been raised.  Tr. 83-84.

On days that he does not work, Woods lies on the couch and watches television.  Tr. 87. His medication makes him drowsy so he may sleep for half the morning.  Tr. 88.  He has no hobbies.  Tr. 88.  He reads "every once in a blue moon."  Tr. 88.  When asked, "Do you have trouble—can you read a newspaper and understand what you're reading?" he answered, "Yeah." Tr. 88.  He sometimes reads fiction but not as much as he used to because he watches television instead.  Tr. 88.  He stays in the house because he does not know anybody and it is hard for him to get around; it also ensures that he stays out of trouble.  Tr. 89.  His wife helps him dress because she likes to do it.  Tr. 89-90.  She also cooks, does the laundry, and shops.  Tr. 90.

### 2. Vocational Expert's Testimony

 Vocational Expert Brett Salkin ("VE") testified at the hearing.  Tr. 92-111.  The ALJ discussed with the VE Woods' past relevant work as a dishwasher, packager, laborer, and forklift operator.  Tr. 94.  The ALJ asked the VE to determine whether a hypothetical individual who performed Woods' past jobs of packager and salvage laborer could perform those jobs if the individual had the following characteristics: can work at all exertional levels and can perform simple, repetitive tasks in a setting with no fast pace, no strict production demands, and no more than infrequent changes that can be adequately explained; can occasionally interact with supervisors and co-workers, if that interaction is limited to speaking and signaling; and cannot interact with the public.  Tr. 95-96.  The VE answered that such an individual could perform the

10

job of salvage laborer. Tr. 96. The ALJ asked if such an individual could perform any other

work and the VE answered that such an individual could perform work as a cleaner (600 local

jobs; 2,800 Ohio jobs; 84,000 national jobs), dishwasher (1,000 local jobs; 5,800 Ohio jobs;

190,000 national jobs), and warehouse worker (1,100 local jobs; 7,000 Ohio jobs; 140,000

national jobs). Tr. 96-97.

Next, the ALJ asked the VE if an individual could perform those jobs or any other work

if the individual would be off task 20 percent of the time. Tr. 101. The VE replied that such an

individual could not perform any work. Tr. 101.

Woods' attorney asked the VE to clarify and explain the numbers he provided for the

jobs listed above and they discussed subsections of jobs included in the common title job

descriptions. Tr. 101-108. Woods' attorney asked the VE where he received training to apply a

formula to arrive at the number of jobs that exist and the VE described the training he received.

Tr. 109. Woods' attorney next asked the VE, based on his experience, if a person who is capable

of doing more exertionally is more easily placed in a job. Tr. 110. The VE replied that this is

true. Tr. 110. Woods' attorney asked whether, if two people with similar backgrounds applied

for the same job, it could be said that the person with more physical or mental abilities is more

likely to get the job. Tr. 111. The VE stated that he could not answer the question because it is a

hiring question. Tr. 111.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability. "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

> 1.  If the claimant is doing substantial gainful activity, he is not disabled.
>
> 2.  If claimant is not doing substantial gainful activity, his impairment must
>     be severe before he can be found to be disabled.
>
> 3.  If claimant is not doing substantial gainful activity, is suffering from a
>     severe impairment that has lasted or is expected to last for a continuous
>     period of at least twelve months, and his impairment meets or equals a
>     listed impairment, claimant is presumed disabled without further inquiry.
>
> 4.  If the impairment does not meet or equal a listed impairment, the ALJ
>     must assess the claimant's residual functional capacity and use it to
>     determine if claimant's impairment prevents him from doing past relevant
>     work.  If claimant's impairment does not prevent him from doing his past
>     relevant work, he is not disabled.
>
> 5.  If claimant is unable to perform past relevant work, he is not disabled if,
>     based on his vocational factors and residual functional capacity, he is
>     capable of performing other work that exists in significant numbers in the
>     national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his May 21, 2014, decision, the ALJ made the following findings:

1.   The claimant was insured for a period of disability and disability insurance benefits on the May 10, 2010 alleged onset date, and he remains insured for these benefits through at least June 30, 2017.  Tr. 21.

2.   The claimant has not engaged in disqualifying substantial gainful activity at any time since the May 10, 2010 alleged onset date.  Tr. 21.

3.   The claimant has the following "severe" medical impairments: borderline intellectual functioning, an affective disorder, and an anxiety-related disorder.  Tr. 21.

4.   Since the May 10, 2010 alleged onset date, the claimant has not had an impairment, or a combination of impairments, that has met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 24.

5.   Since the May 10, 2010 alleged onset date, and with the exception of possible briefer periods of less than 12 continuous months, the claimant has retained the residual functional capacity to perform all the basic work activities described in 20 CFR 404.1521 and 404.1545 without any exertional limitations subject to the following non-exertional limitations/restrictions: he can perform simple, repetitive tasks in jobs that do not have to be performed at a fast pace or where strict production demands must be met so long as the work does not involve more than infrequent changes that can be adequately explained.  The claimant can also occasionally interact with supervisors and co-workers, if that interaction is limited to speaking and signaling, but he cannot interact with members of the public.  Tr. 25.

6.   The claimant has been able to perform past relevant work since the May 10, 2010 alleged onset date.  Tr. 28.

---

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

7.      Although the undersigned has found above that the claimant has been capable of performing past relevant work, and is, therefore, not disabled at step four of the sequential evaluation process, there are other jobs existing in significant numbers in the economy that the claimant has been able to perform since the May 10, 2010 alleged onset date.  Therefore, the undersigned makes the following alternative findings for step five of the sequential evaluation process.  Tr. 30.

8.      The claimant has not been under a disability, as defined in the Social Security Act, at any time between the May 10, 2010 alleged onset date and the date of this decision.  Tr. 31.

## V. Parties' Arguments

Woods objects to the ALJ's decision on two grounds.  He argues that the ALJ erred with respect to the opinion evidence in that he did not include all the limitations assessed by Woods' treating source, Dr. Rhee; he did not give good reasons for the weight he gave to the opinion of consultative examiner Mr. Davis; and he failed to address the opinion of Woods' other treating source, Dr. Nagrant.  Doc. 13, pp. 5-10.  Woods also contends that the ALJ should have ordered intelligence testing at Step Three and considered whether Woods met Listing 12.05, Intellectual Disability.  Doc. 13, pp. 11-13.  In response, the Commissioner submits that the ALJ did not err in his Step Three determination or his residual functional capacity ("RFC") assessment and that his findings are supported by substantial evidence.  Doc. 14, pp. 8-15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.  The ALJ did not err in assessing the opinion evidence

#### 1.  The ALJ's RFC assessment is consistent with Dr. Rhee's opinion

Woods argues that the ALJ "failed to provide any explanation as to why he did not incorporate all of the limitations [found by Dr. Rhee] in his [RFC] assessment" despite assigning "great weight" to Dr. Rhee's opinion.  Doc. 13, p. 6.  Woods concedes that Dr. Rhee "did not offer a functional assessment per se, but instead outlined Mr. Woods' mental status examination findings," including "easily distracted, can't focus, can't perform task, can't grasp simple concepts."  Doc. 13, p. 6; Tr. 312.  Dr. Rhee also described Woods' cognitive status as a "marginal cognitive ability and fund of knowledge," low IQ, and "short" attention and concentration.  Tr. 312.  Woods argues that these "significant limitations" are at odds with the ALJ's RFC determination that Woods can perform simple, repetitive tasks in jobs with no fast pace or strict production demands and no more than infrequent changes that can be adequately explained.  Doc. 13, p. 6; Tr. 25.

The undersigned disagrees.  The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician. *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c) and 416.946(c)).  An ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Id*.  This is especially true when, as here, the opinion evidence did not offer a functional assessment.  Dr. Rhee's opinion that Woods "can't perform task" is, essentially, a

determination that Woods is unable to perform work; such a determination is reserved for the Commissioner. *Kidd v. Comm'r of Soc. Sec.*, 283 Fed.App'x 336, 341 (6th Cir. 2008) ("[T]he ultimate issue of disability is reserved to the Commissioner."). Dr. Rhee's opinion that Woods "can't grasp simple concepts" is not interchangeable with "cannot perform simple tasks," as Woods appears to suggest. In other words, Dr. Rhee's opinion does not conflict with the ALJ's RFC assessment, and the ALJ was not required to explain why he did not include the limitation "can't grasp simple concepts" in his RFC assessment. *See* Social Security Ruling 96–8p, 1996 WL 374184, at *7 ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). Finally, in another portion of his decision, the ALJ remarked that he rejected the notion that Woods had more severe limitations, noting that Dr. Rhee assigned Woods a GAF score of 55, which is indicative of moderate symptoms. Tr. 27, 28. In short, Dr. Rhee's opinion as a whole does not indicate more than moderate symptoms, including assigning Woods a GAF score of 55 (Tr. 313), and Woods does not explain how the ALJ's RFC assessment is incompatible with these moderate limitations or what further limitations should have been included. Again, the ALJ limited Woods to performing simple, repetitive tasks, with no fast-pace or strict production demands and only infrequent changes that can be adequately explained. Thus, the ALJ's RFC assessment was consistent with Dr. Rhee's opinion and Wood's argument is without merit.

### 2. The ALJ gave good reasons for assigning Mr. Davis' opinion "lesser" weight

Woods next argues that the ALJ failed to provide good reasons for giving "lesser" weight to Mr. Davis' opinion.[5]  Doc. 13, pp. 5, 6-7.  He argues that Mr. Davis' opinion is "entirely

---

[5]  Woods, in his reply brief, challenges the Commissioner's reference to Davis as "Mr." and not "Dr."  Doc. 17, p. 3. Davis, a clinical psychologist, identifies himself as having an "MA" (Tr. 352) and, thus, is not a doctor.  The distinction is irrelevant for purposes of the undersigned's analysis.

consistent with the underlying evidence" establishing that Woods is "severely limited intellectually and cannot relate to others or perform simple tasks adequately."  Doc. 13, p. 6.

Again, the undersigned disagrees.  The ALJ explained that he assigned "lesser" weight to Mr. Davis' "more restrictive opinions because they are not supported by the evidence as a whole including the evidence that has been cited to in this decision, which, as above, includes the opinions of the above-mentioned treating psychiatrist [Dr. Rhee]."  Tr. 28.  Elsewhere in his decision, the ALJ described evidence indicating that Woods' limitations are not as severe as alleged, including: Woods has been able to adequately interact with others; has been able to engage in a romantic relationship and has friends; treatment notes show he was described on numerous occasions as being "alert and/or properly oriented, and/or as having good concentration abilities" (including during a psychiatric assessment, Tr. 321, 325);  that side effects from his psychotropic medications are not present in his medical charts; that Woods has repeatedly been assigned a GAF score  in the moderate 55-60 range, notwithstanding Mr. Davis' GAF assessment of 45, indicating serious limitations, on one occasion;[6] he has never been treated emergently for a mental impairment; and he has been able to work part-time.  Tr. 27-28.  Thus, by considering the supportability and consistency of Mr. Davis' opinion, the ALJ complied with the requirements set forth in 20 C.F.R. § 404.1527(c), his decision is supported by substantial evidence, and, therefore, must be upheld.  *See id.* (an ALJ evaluates a non-treating source opinion by considering the supportability and consistency of the opinion, the specialization of the medical source, and any other factors raised by the claimant or others); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (A court "defer[s] to an agency's decision 'even if there is substantial evidence in the record that would have supported

_____

[6]  The ALJ stated that he did not find that Woods has been functioning in a manner indicated by a GAF score below 51 over any continuous 12-month period following the alleged onset date.  Tr. 27.

an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'").

### 3.  The ALJ was not required to address Dr. Nagrant's statement

Woods asserts, "the ALJ failed altogether to discuss the opinion of Dr. Nagrant that Mr. Woods' physical and mental impairments would make it difficult to work in a reliable and consistent fashion."  Doc. 13, p. 7 (emphasis removed).  However, Dr. Nagrant did not produce a medical opinion for the ALJ to consider.  Dr. Nagrant stated, in a treatment note, "[Woods] has moderate physical limitations and severe psychiatric and mental impairments making it difficult for him to find work and to work in a reliable and consistent fashion."  Tr. 340.  This is not a statement "that reflect[s] judgment[] about the nature and severity of [Woods'] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions."  20 C.F.R. § 416.927(a)(2) (defining "medical opinions").  Moreover, Dr. Nagrant's statement was, at bottom, an assertion that Woods would have difficulty sustaining employment, which is a determination reserved for the Commissioner.[7] *See* 20 C.F.R. § 416.927(d)(1) (the Commissioner is responsible for determining whether a claimant is disabled). And the ALJ cited to Dr. Nagrant's treatment notes, indicating that he took this evidence into account.  *See* Tr. 26-27.   In sum, the ALJ was not required to discuss Dr. Nagrant's statement that Woods would have difficulty working in a reliable and consistent fashion.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507-508 (6th Cir. 2006) (an ALJ is not required to address every piece of evidence in the record).

### B.  The ALJ was not required to order further testing and did not err at Step Three

---

[7]  Dr. Nagrant's same treatment note reads, under "subjective," "[Woods] can handle simple, defined tasks, but cannot perform the executive functions to multitask or problem solve well."  Tr. 339.

Woods argues that the ALJ erred because he "failed to order intelligence testing" so that he could determine whether Woods met or equaled Listing 12.05.  Doc. 13, p. 12.

An ALJ is not required to order additional testing.  *Foster v. Halter*, 279 F.3d 348, 355-356 (6th Cir. 2002); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986); 20 C.F.R. § 404.1517.  Moreover, Woods cannot show that his impairment meets or medically equals Listing 12.05.  Listing 12.05 provides,

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Pt. 404, Subpt. P, App.1.[8]  In order to satisfy the diagnostic description, a claimant must prove that he meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations."  *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. App'x 672, 675 (6th Cir. 2009).  Additionally, a claimant must meet at least one of the following requirements:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> > 1. Marked restriction of activities of daily living; or
> > 2. Marked difficulties in maintaining social functioning; or
> > 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> > 4. Repeated episodes of decompensation, each of extended duration.

---

[8] Listing 12.05 was formerly titled "mental retardation."  *See* 78 Fed.Reg. 46,499 (August 1, 2013).

20 C.F.R. Pt. 404, Subpt. P, App.1.

Woods argues only that the ALJ should have ordered intelligence testing; he does not describe which subsection of Listing 12.05 he allegedly meets.  Finally, Woods does not allege, nor does he attempt to show, an onset of an impairment before age 22, as required to meet Listing 12.05.  *See Foster*, 279 F.3d at 354-355 (evidence did not demonstrate onset of impairment before age 22 when none of the claimant's "testing or evaluation was contemporaneous with her developmental period; she was already 42 years of age when the first testing was performed" and the mere fact that she left school after completing ninth grade was insufficient); *Hayes*, 357 Fed. App'x at 677 (Listing 12.05 is not met when claimant fails to establish onset before age twenty-two); *cf. Napier v. Comm'r of Soc. Sec.*, 2014 WL 5308581 at *4 (S.D.Ohio Oct. 16, 2014) (remanding in part because claimant's records indicated "significant, well-documented and persistent deficits in multiple academic and social areas" throughout her school years).  Thus, even if Woods obtained further testing, it would not be contemporaneous with his developmental period and there is no significant, well documented record of persistent deficits throughout his school years.  *Id.*; *Foster*, 279 F.3d at 355.[9]

Furthermore, Woods does not identify evidence showing that he is dependent upon others for personal needs; although he depends heavily upon his wife, Woods' testimony indicates that this is a matter of choice than necessity.  Tr. 89-90.  Finally, Woods does not point to evidence showing he has "significantly subaverage general intellectual function with deficits in adaptive functioning."  20 C.F.R. Pt. 404, Subpt. P, App.1.  "The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills."  *Hayes*, 357 Fed. App'x at 677 (citing *Heller v. Doe*, 509 U.S. 312, 329 (1993)).  Although Woods states that he "has a very poor work history" and has held a job "only for brief

---

[9]  The claimant in *Foster*, unlike Woods, did not obtain a GED despite four attempts.  279 F.3d at 351.

periods of time," Doc. 13, p. 12, the record belies Woods' assertion; Woods worked as a salvage laborer for six years and, at the time of the hearing, had been washing dishes for six months.  Tr. 70, 73.  On its face, Woods cannot show that he meets or medically equals Listing 12.05; therefore, the ALJ did not err by not considering Listing 12.05.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: December 1, 2015

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)